UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MASSACHUSETTS BAY TRANSPORTATION AUTHORITY,<br><br>      Plaintiff,<br><br>v.<br><br>NATIONAL RAILROAD PASSENGER CORP., d/b/a AMTRAK, and NORTHEAST CORRIDOR INFRASTRUCTURE AND OPERATIONS ADVISORY COMMISSION,<br><br>      Defendants. | Civil Action No. 16-10120 |

## __COMPLAINT__

Plaintiff Massachusetts Bay Transit Authority ("MBTA") brings this complaint for declaratory and injunctive relief against defendants National Railroad Passenger Corp., d/b/a Amtrak ("Amtrak"), and the Northeast Corridor Infrastructure and Operations Advisory Commission ("Commission").  Amtrak has demanded nearly $30 million per year from the MBTA for *Amtrak's* use of *MBTA's* rail lines, based on a "Cost Sharing Policy" (the "Policy") developed by the Commission pursuant to a federal statute, the Passenger Rail Investment and Improvement Act of 2008 ("PRIIA"), Pub. L. No. 110-432, Div. B, 122 Stat. 4848, 4907 (2008).  Amtrak's demand violates an existing agreement between Amtrak and MBTA, and the Commission's Policy violates the U.S. Constitution's Appointments and Due Process Clauses, the Constitution's separation of powers, and the federal Administrative Procedure Act, as described in detail below.  MBTA accordingly alleges as follows:

## INTRODUCTION

1.     Defendant Amtrak, the federal government entity responsible for (*inter alia*) intercity rail passenger service between Boston, MA and Washington, D.C. (the "Northeast Corridor"), obtains access to the rail line between Boston and the Rhode Island border (the "Attleboro Line") under a contract (the "Attleboro Line Agreement") with plaintiff MBTA, a Massachusetts government entity and the owner of the Attleboro Line.  In exchange for MBTA granting Amtrak access to the Attleboro Line and the right to "dispatch" (*i.e.*, to control) when Amtrak's high-speed intercity trains and MBTA's commuter trains are dispatched on the Line, Amtrak agreed to provide MBTA with certain services and maintenance along the Line *without charge*.  Now, however, claiming that it is both permitted and required to do so under a pair of federal statutes, Amtrak is demanding that MBTA pay it tens of millions of dollars each year for the very services that Amtrak already is obligated by the Attleboro Line Agreement to provide MBTA without charge, with no recognition of the value of MBTA's ownership of the Attleboro Line or the value of the dispatch rights.

2.     According to Amtrak, MBTA must pay it this money as a result of PRIIA and the Fixing America's Service Transportation Act (the "FAST Act"), Pub. L. No. 114-94, 129 Stat. 1312 (2015).  Under those statutes, as codified at 49 U.S.C. § 24905, Congress set up the Commission, a body consisting of representatives of the federal and state governments, and tasked it with establishing the Cost Sharing Policy to replace the terms of existing contracts between Amtrak and state commuter rail agencies for rail access.  After the Commission promulgated the Cost Sharing Policy this October, Amtrak repudiated the Attleboro Line Agreement and demanded that MBTA enter a new contract implementing the Policy.  If MBTA

will not agree to do so, then Amtrak is threatening to file an action before the federal Surface

Transportation Board ("STB") to force the Cost Sharing Policy on MBTA.

3.       MBTA brings this lawsuit because the federal law that Amtrak is invoking to

justify its demand for nearly $30 million in cost-sharing payments for this year alone is

unconstitutional, and because Congress cannot by statute relieve federal agencies, such as

Amtrak, from their contractual obligations without putting those agencies into breach of contract.

Whether or not Amtrak should have more money for its maintenance responsibilities along the

Northeast Corridor, the answer is not to simply take that money from Massachusetts and a few

other states in violation of the constitution and their contractual rights.  Resolution of the issues

raised in this complaint is urgent, as the allocation of costs between MBTA and Amtrak has

significant implications for Massachusetts commuters, Massachusetts taxpayers, and MBTA's

relations with its vendors.  MBTA's specific claims are as follows:

4.       *First*, because § 24905 vests executive power in the Commission—the power to

determine the substantive standard that must be implemented by Amtrak and state commuter rail

agencies in new contracts and that must be applied by the STB in adjudicating disputes between

Amtrak and state commuter rail agencies—it violates the Appointments Clause of the

Constitution.  *See* U.S. Const., art. II, § 2, cl. 2.  Only "Officers" of the federal government may

exercise such executive authority, and at least half of the members of the Commission are not

appointed consistent with the Appointments Clause.

5.       *Second*, and related, § 24905 violates the Constitution's separation of powers

because it vests federal executive authority in Commission members who are not removable by,

and thus are not accountable to, the President or any other member of the Executive Branch, but

instead are answerable only to state officials.  By delegating federal regulatory authority to

officials who are ultimately accountable to persons other than the President of the United States, the FAST Act violates the separation of powers. *See Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 496-97 (2010).

6.      *Third*, § 24905 violates the Due Process Clause of the Constitution, which requires that regulators be neutral and disinterested.  Under § 24905 members of the Commission represent the entities that appointed them, all of which have a direct financial interest in the Cost Sharing Policy's allocation of fiscal responsibility for work on the Northeast Corridor.  The Cost Sharing Policy, unfairly determined by a vote of the regulated entities themselves, shifts tens of millions of dollars from a handful of states—including Massachusetts—to Amtrak (a net winner overall), while rewarding a majority of other States with millions in cost savings on their contracts with Amtrak.  This is an obvious violation of Due Process.

7.      *Fourth*, the Commission's Policy must be set aside as unlawful under the federal Administrative Procedure Act ("APA").  *See* 5 U.S.C. § 706(2).  The APA requires any substantive rule adopted by an agency, such as the Cost Sharing Policy, to be promulgated through notice and comment rulemaking, 5 U.S.C. § 553, and the Commission indisputably did not follow those procedures in adopting the Policy.  Thus, even if the Commission could adopt the Cost Sharing Policy consistent with the Constitution—and it cannot—the Policy would still need to be remanded for the APA's important procedural requirements to be fulfilled.

8.      *Fifth*, claiming the right to do so under PRIIA and the FAST Act, Amtrak has repudiated the Attleboro Line Agreement.  MBTA does not accept Amtrak's repudiation of the Agreement, which remains a valid, binding, contract.  As a matter of Supreme Court precedent, PRIIA and the FAST Act cannot excuse Amtrak's breach of contract. *United States v. Winstar Corp.*, 518 U.S. 839, 843 (1996).  MBTA is entitled to a declaration that Amtrak is contractually

obligated to continue performing under the Attleboro Line Agreement so long as that Agreement remains in force pursuant to its own terms, and an injunction requiring it to do so.

9.      *Sixth*, Amtrak has breached the implied covenant of good faith and fair dealing in the Attleboro Line Agreement by threatening to go to the STB unless MBTA agrees to pay Amtrak millions of dollars per year for services that Amtrak already is obligated by contract to provide without charge.

10.      Wherefore, MBTA asks this Court to declare that Section 212 of PRIIA, as amended by Section 11305 of the FAST Act, 49 U.S.C. § 24905, violates the Appointments Clause, the separation of powers, and the Due Process Clause; to declare the Cost Sharing Policy invalid and to set it aside; to find Amtrak in breach of the Attleboro Line Agreement and the implied covenant of good faith and fair dealing in that Agreement; and to enter an injunction requiring Amtrak to continue acting in conformance with the Attleboro Line Agreement.

## THE PARTIES

11.      Plaintiff MBTA was established by Massachusetts law to provide, *inter alia*, commuter rail transportation within the Commonwealth.  It is a public entity, designated a "body politic and corporate, and a political subdivision of the commonwealth." Mass. Gen. Laws ch. 161A, § 2.  MBTA has its principal office and principal place of business in Boston, Massachusetts, and is a citizen of Massachusetts.

12.      Defendant Amtrak was established by Congress in the Rail Passenger Service Act of 1970, Pub. L. No. 91-518, 84 Stat. 1327 (1970), to provide intercity rail passenger transportation in the United States.  All of Amtrak's preferred shares are owned by the U.S. Department of Transportation and, for purposes of the United States Constitution, Amtrak is deemed a federal government, not a private, entity.  *Dep't of Transp. v. Ass'n of Am. R.R.s*, 135

S. Ct. 1225, 1233 (2015).  Amtrak has its principal office and principal place of business in the

District of Columbia.  49 U.S.C. § 24301(b).  "Amtrak is a citizen only of the District of

Columbia when deciding original jurisdiction of the district courts of the United States in a civil

action." *Id.*

13.     Defendant the Commission was established by PRIIA and is responsible for

establishing the Cost Sharing Policy.  The Commission is administratively hosted by Amtrak.

The Commission consists of nine voting members appointed by the governors of Massachusetts,

Rhode Island, Connecticut, New York, New Jersey, Pennsylvania, Maryland, and Delaware, and

by the mayor of Washington, D.C., together with four voting members from Amtrak and five

voting members from the U.S. Department of Transportation.  Non-voting members from

various other States and entities also participate on the Commission.

## JURISDICTION AND VENUE

14.     This case raises federal questions arising under the Appointments Clause, U.S.

Const., art. II, § 2, cl. 2, the Constitution's separation of powers, and the Due Process Clause of

the Fifth Amendment.  *See, e.g.*, *Free Enter. Fund*, 561 U.S. at 491 n.2.  It also raises questions

arising under the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*

15.     This Court has subject matter jurisdiction over the claims brought in this action

pursuant to 28 U.S.C. §§ 1331 and 1367.  The Court may issue declaratory relief under 28 U.S.C.

§ 2201.

16.     Jurisdiction and venue are proper in this district pursuant to 28 U.S.C.

§§ 1391(b)(2) and (e)(1)(B) because a substantial part of the events or omissions giving rise to

these claims occurred in Massachusetts, and a substantial part of the property (the Attleboro

Line) that is the subject of this controversy is located in Massachusetts.  The Attleboro Line

Agreement contains a forum selection clause designating this district for purposes of claims arising under the Agreement.  Agreement § 25.2.

## FACTS RELATING TO THIS DISPUTE

**A.**     **The Relationship Between Amtrak And State Commuter Rail Agencies, Such As MBTA**

17.     State commuter rail systems are a crucial component of the transportation network in States such as Massachusetts that contain densely populated, heavily urbanized areas (*e.g.*, the Boston metropolitan area).  Within the States making up the Northeast Corridor, state commuter rail agencies provide "short haul" rail service to hundreds of thousands of passengers every business day.

18.     MBTA's commuter rail trains provide transportation to an average of more than 125,000 passengers each business day.  MBTA has contracted with a private corporation, Keolis Commuter Services, to operate the commuter rail under a fixed-price contract.  Revenue from commuter rail passengers and other sources does not cover all of MBTA's costs of running the commuter rail service, however, and MBTA receives subsidies from the Massachusetts state government to make up the difference.

19.     Amtrak provides long-distance passenger service between major metropolitan areas, including the high speed "Acela" service connecting cities such as Boston, New York, Philadelphia, and Washington, D.C.  Amtrak carries approximately 40,000 passengers each business day in the Northeast Corridor and, on information and belief, earns hundreds of millions of dollars each year in profits on its Northeast Corridor trains.  Indeed, Amtrak's share of the combined market for travel by air and rail between New York and Boston has increased from 20% to 54% since the introduction of Amtrak's Acela service in 2000.

20.     Often, Amtrak and the state commuter rail agencies run some or all of their trains on the same rail lines.  Within Massachusetts, MBTA and Amtrak each run trains along the Attleboro Line, which since 1973 has been owned by MBTA.  (MBTA also runs trains along numerous other lines it owns that are not normally used by Amtrak, such as the "Fitchburg Line").

21.     MBTA's ownership of its rail lines is an extremely valuable asset, representing a considerable historical and ongoing investment by Massachusetts.  MBTA originally purchased the Attleboro Line from the Penn Central Transportation Company in 1973 for $19,500,000, and has invested many millions of dollars in the Line and related property rights since that time.

22.     MBTA's ownership of the Attleboro Line also includes the right to allocate station slots and to decide when to dispatch trains on the line—or the right to bargain away its dispatch rights to Amtrak for other services.  Given the importance of high-speed rail service to Amtrak's profitable Northeast Corridor business, the ability to determine which trains have priority on the Attleboro Line is a highly valuable right.

23.     In most other States on the Northeast Corridor, it is Amtrak that owns the rail line and provides state commuter rail agencies with access to it.  Within the Northeast Corridor, only Massachusetts, Connecticut, and New York own any of the rail line that Amtrak uses.  In New York and Connecticut, but *not* in Massachusetts, Amtrak also owns much of the line along which its trains run *and* provides the state commuter rail agency access to such track for commuter rail service.  By contrast, in Massachusetts, Amtrak does not own any track that MBTA uses.

24.     Historically, Amtrak and state commuter rail agencies have negotiated bilateral agreements governing topics such as access to each other's rail assets, maintenance performed on rail lines, and station operations.

25.     In the absence of such agreements, federal law requires Amtrak to provide access to track it owns to state commuter rail agencies, 49 U.S.C. § 24904 (renumbered § 24903 under the FAST Act), and likewise requires state commuter rail agencies to provide access to rail lines they own to Amtrak, *id.* § 24308.  In both instances, if Amtrak and the relevant state commuter rail agency cannot agree on the compensation to be provided for such access and related services, then the STB would decide the amount of compensation to be paid *to the rail owner* by the party obtaining rail access based on criteria specified in the relevant statutory provision.  *See id.* § 24308(a)(2)(A); *id.* § 24904(c)(2).  Neither of these provisions provides for the STB to enter a net award of costs *against the rail owner* with respect to services provided by the accessing carrier; the allocation of such costs is purely a question of contract.

### B.     The Attleboro Line Agreement

26.     On July 1, 2003, MBTA and Amtrak entered the Attleboro Line Agreement, which has since been amended a number of times.  The Agreement has a term of thirty years and (except for specified causes) is terminable by either party only on provision of 12 months' notice.  Agreement §§ 10, 23.2.  The Agreement is governed by Massachusetts law.  *Id.* § 28.1.

27.     Under the Attleboro Line Agreement, MBTA provides Amtrak the right to use the Attleboro Line (and, as necessary for support, certain other MBTA-owned rail lines) for the operation of a specified number of trains per hour.  Agreement § 2.1.

28.     The Attleboro Line Agreement notes that "both the MBTA and Amtrak value highly the right to dispatch trains running over the Attleboro Line, and the MBTA agrees to allow Amtrak to dispatch such trains in exchange for other services."  Attleboro Line Agreement at 1.

29.     In exchange for access to the Attleboro Line and dispatching rights, Amtrak provides MBTA with specified dispatch and maintenance services on the Attleboro Line.

Agreement §§ 2.2, 4.1.  Amtrak is "responsible for the costs of materials, equipment, management, services, and other expenses required for the performance" of such maintenance. *Id*. § 4.4.  Amtrak also provides MBTA with access to Amtrak-owned rail line between the Massachusetts-Rhode Island border and Providence, Rhode Island.  *Id*. § 2.1(g).

30.     Except as specified in the Agreement, neither party to the Attleboro Line Agreement is obligated to pay the other any fiscal compensation in exchange for the rail access and services exchanged under the Agreement: "Amtrak shall perform the Dispatching Services and Maintenance Services as detailed in Sections 2.2 and 4.1 herein, as well as all other obligations detailed in this Agreement (with the exception of Force Account Work, which shall be compensated as detailed below) in exchange for the operating rights detailed in Section 2.1 above and the right to perform Dispatching Services, as detailed in Section 2.2."  Agreement § 3.1; *see also id*. § 3.3 ("Neither Party shall charge the other Party any fees for access to stations on the Attleboro Line, other MBTA lines, or the Amtrak Rail Line.").

31.     In the Attleboro Line Agreement, Amtrak specifically agreed to relieve MBTA from any obligation to maintain the Attleboro Line for purposes of Amtrak's provision of intercity passenger rail service: "The MBTA shall not *in any way* be obligated to provide maintenance necessary or incidental to Amtrak's intercity rail passenger service on the Attleboro Line."  Agreement § 4.2 (emphasis added).  The Agreement further specifies that "Amtrak shall have the right to improve, *at its sole expense*, the track and facilities it uses or may use on the Attleboro Line in intercity rail passenger service," and "Amtrak shall be *solely responsible* for any and all costs associated with the operation and maintenance of such improvements."  *Id*. § 4.6(a), (b) (emphases added).  The Attleboro Line Agreement has no provision under which

Amtrak can require MBTA to pay for capital improvements, of Amtrak's choosing, on the Attleboro Line.

32.     The Attleboro Line Agreement contemplates the possibility that Amtrak's maintenance obligations on the Attleboro Line could increase due to changes in MBTA operations or modifications to the Attleboro Line undertaken on behalf of MBTA, and provides a specific procedure and standard for determining the compensation—if any—that must be paid to Amtrak to account for such increased maintenance.  Agreement § 3.7.  Thus, Amtrak is not without remedy under the existing Agreement if MBTA causes maintenance needs on the Attleboro Line to increase.

33.     The Attleboro Line Agreement also contains a provision under which Amtrak may propose "recapitalization projects."  MBTA, however, is not required to fund such projects.  If MBTA concludes "in its sole discretion" that certain projects proposed by Amtrak are not worth undertaking, then it can choose not to fund the projects.  Agreement § 4.9.

34.     The parties selected a "federal court in Massachusetts" as the forum for any dispute concerning "the interpretation, application or enforcement" of the Attleboro Line Agreement.  Agreement § 25.2.

**C.     Congress Enacts PRIIA and the FAST Act**

35.     On October 16, 2008, PRIIA was signed into law.  One purpose of PRIIA was to provide additional money to Amtrak for its maintenance and capital improvement needs on the Northeast Corridor.  Historically, the federal government failed to provide Amtrak with consistent policy or financial commitments to support the mission it has prescribed for the company, or to support intercity passenger rail in general.  This hampered Amtrak's ability to both set and achieve goals, including the improvement of the Northeast Corridor.

36.     Most relevant to this case is Section 212 of PRIIA, which established the Commission and provided for the Commission's adoption of a Cost Sharing Policy.  49 U.S.C. § 24905.

37.     PRIIA directed the Secretary of Transportation to establish the Commission.  49 U.S.C. § 24905(a)(1).  The Secretary, however, does not appoint all of the Commission's members.  The chief executive officers of the States and the District of Columbia in the Northeast Corridor each appoint one member to the Commission; that member is "designated by, and serving at the pleasure of" the state chief executive officer.  *Id*. § 24905(a)(1)(C).  Nine members of the Commission—half of the 18 voting members—have been appointed in such a fashion.  Four more Commission members represent Amtrak.

38.     The Commission functions as part of the Federal government.  It can request that a federal department or agency "detail, on a reimbursable basis, any personnel of that department or agency to the Commission to assist in in carrying out its duties," and similarly request "administrative support services" from the Administrator of General Services.  49 U.S.C. § 24905(a)(8), (9).

39.     As reflected in its name (the "Northeast Corridor Infrastructure and Operations *Advisory* Commission"), the Commission's role is partly advisory in nature.  One purpose of the Commission is "to promote cooperation and planning pertaining to the rail operations and related activities of the Northeast Corridor."  49 U.S.C. § 24905(a)(1).  To that end, the  Commission is tasked with "develop[ing] a statement of goals concerning the future of the Northeast Corridor rail infrastructure and operations," and "develop[ing] recommendations based on the statement." *Id.* § 24905(b)(1), (2).

40.     As most relevant here, the Commission is further directed to "develop a standardized formula for determining and allocating costs, revenues, and compensation for Northeast Corridor commuter rail passenger transportation . . . on the Northeast Corridor main line between Boston, Massachusetts, and Washington, District of Columbia," and certain branch lines.  49 U.S.C. § 24905(c)(1)(A).

41.     The Cost Sharing Policy developed by the Commission is required to "ensure" that three statutory objectives are met: "(i) there is no cross-subsidization of commuter rail passenger, intercity rail passenger, or freight rail transportation; (ii) each service is assigned the costs incurred only for the benefit of that service, and a proportionate share, based upon factors that reasonably reflect relative use, of costs incurred for the common benefit of more than 1 service; and (iii) all financial contributions made by an operator of a service that benefit an infrastructure owner other than the operator are considered, including but not limited to, any capital infrastructure investments and in-kind services."  49 U.S.C. § 24905(c)(1)(A).

42.     Once the Cost Sharing Policy is finalized, PRIIA *requires* Amtrak and the state commuter rail agencies to repudiate their existing agreements and to "implement *new* agreements for usage or services based on the formula" contained in the Policy.  49 U.S.C. § 24905(c)(2) (emphasis added).

43.     PRIIA initially set up a procedure whereby, if the parties failed to enter new agreements, "the Commission shall petition the Surface Transportation Board to determine the appropriate compensation amounts for such services in accordance with Section 24904(c) [now § 24903(c)] of this title.  The Surface Transportation Board shall enforce its determination on the party or parties involved."  49 U.S.C. § 24905(c)(2).  Those compensation amounts would not be determined pursuant to the Cost Sharing Policy, but rather the statutory criteria in § 24903(c).

44.     PRIIA's process for situations in which a state commuter rail agency declines to enter a new contract was amended on December 4, 2015, when the President signed the FAST Act into law.  The FAST Act modified Section 24905(c)(2) such that the STB is no longer instructed to determine compensation amounts by applying the statutory criteria in what is now § 24903.  In place of those statutory criteria, the FAST Act instructs the STB to determine compensation by "taking into consideration the policy developed [by the Commission], as applicable."  Congress limited the STB to looking at § 24903 only for "procedures" and a "procedural schedule."

45.     Because Congress has instructed the STB to consider the Cost Sharing Policy in determining compensation, STB must do so; it cannot choose to disregard the Policy in setting compensation.  Moreover, and importantly, *no other intelligible principle* is provided to guide the agency's compensation decisions.  The STB cannot revise or alter the policy; only the Commission may make changes to the Policy.  49 U.S.C. § 24905(c)(3).  If the STB decides compensation based on some factor not identified in the Policy, it will be in violation of Congress's mandate.

46.     The FAST Act contains a carrot and stick designed to convince state commuter rail agencies to sign new agreements with Amtrak implementing the Cost Sharing Policy. Section 11302 of the FAST Act introduces 49 U.S.C. § 24911, "Federal-State partnership for state of good repair."  Under § 24911, Congress provided for a system of federal grants, administered by the Secretary of Transportation, for railway capital projects.

47.     With respect to the Northeast Corridor, however, § 24911 provides that "[g]rant funds may not be provided under this section to an eligible recipient for an eligible project located on the Northeast Corridor unless Amtrak and the public authorities providing commuter

rail passenger transportation on the Northeast Corridor are in compliance with section 24905(c)(2)." 49 U.S.C. § 24911(e)(1).  Section 24905(c)(2), again, directs Amtrak and the state commuter rail agencies to enter new agreements implementing the Cost Sharing Policy.

48.     Thus, state commuter rail agencies are penalized if they do not enter new agreements with Amtrak.  Until they do (and seemingly until they all do), otherwise available Federal funds will not be provided for § 29411 projects within the Northeast Corridor.

### D.     The Commission Develops The Cost Sharing Policy

49.     The Commission spent three years developing the standardized formula as required by PRIIA, establishing a Cost Allocation Committee to lead this effort.

50.     The Commission finally adopted an interim policy in December 2014.  The Commission did not publish notice in the Federal Register with respect to the draft Cost Sharing Policy and call for public comments.  This varied from the approach taken by the Federal Railroad Administration ("FRA") and Amtrak in developing "metrics and standards," applicable to its contractual relationships with freight railroads pursuant to Section 207(a) of PRIIA.

51.     On September 17, 2015, the Commission adopted the final Cost Sharing Policy. The Policy was adopted by a 15 to 2 vote, with 1 abstention.  The Commission members appointed by Massachusetts and New York voted against the Policy, and the member appointed by New Jersey abstained.  The Policy was promulgated on October 2, 2015.  On December 7, 2015, the Commission voted to reissue the Policy with various amendments.

52.     The Cost Sharing Policy acknowledges the existing contracts between Amtrak and state commuter rail agencies such as MBTA, but only to disparage them.  According to the Policy, the negotiation of these agreements, entered between agencies of the Federal and state governments, "has often resulted up to this point in serving short-term, parochial interests . . . ." Policy at 17.

53.     The Policy, determined by majority vote of representatives of the very entities it regulates, results in clear winners and losers when applied against the variety of existing contracts between Amtrak and state commuter rail agencies and the varied degrees of track ownership by state commuter rail agencies.  Using the cost sharing formula in the Commission's Policy rather than the existing contracts between Amtrak and state commuter rail agencies, it has been estimated that Amtrak will save about $56 million this fiscal year, Connecticut will save about $20 million, and New York will save about $16 million in comparison to their previous levels of spending.  All told, Amtrak and five of the nine state commuter rail agencies will save money under the Cost Sharing Policy.

54.     The gains for Amtrak and those states are losses for other States.  In particular, Amtrak has asserted that MBTA must make $28.8 million in cost sharing payments not called for under the Attleboro Line Agreement.  Amtrak also is demanding nearly $90 million from New Jersey, nearly $14 million from Pennsylvania, and about $1 million from Maryland.  However, whereas MBTA owns the rail line that Amtrak uses, the commuter rail agencies in New Jersey, Pennsylvania, and Maryland do not.

55.     Generally speaking, the Cost Sharing Policy reaches these allocations by distinguishing between "sole-benefit costs" and "common-benefit costs."  It provides that "sole-benefit costs" will be incurred by the rail operator incurring them, while "common-benefit costs" will be shared between operators based on a variety of metrics (*e.g.*, train moves, train miles, gross ton miles) aimed to determining operators' respective proportional benefit from the expenditure.

56.     The Cost Sharing Policy describes itself as "establish[ing] the *required* cost-sharing methods" for agreements between Amtrak and state commuter rail agencies, together

with "national and regional policy *recommendations* to support them."  Policy at 6 (emphases added).  It likewise states that "[t]he *requirements* set forth in this policy *will be* incorporated into existing or new individual agreements between Amtrak and Commuter Authorities."  Policy § 2.3 (emphases added).

57.    The Cost Sharing Policy expressly contradicts the Attleboro Line Agreement in material aspects.  Under the Attleboro Line Agreement, for example, Amtrak does not charge MBTA for dispatching services—Amtrak performs dispatching in partial exchange for the right to control dispatching, which otherwise belongs to MBTA as to the rail line owner.  Under the Policy, however, Amtrak's dispatching costs on the Attleboro Line must be allocated as common-benefit costs, and Amtrak is demanding millions of dollars per year for them.

58.    The Cost Sharing Policy states that "parties *may* (1) [i]mplement compensation agreements for assets and services not addressed within the policy," and "(2) [a]gree to terms that exceed compensation amounts due under the policy, provided such agreements do not result in cross-subsidization of commuter rail passenger, intercity rail passenger, or freight rail transportation."  Policy at 34 (emphasis added).  Nothing in the Policy, however, *requires* compensation for "assets and services not addressed within the policy."  And to the extent § 24905(c) eliminates existing agreements setting compensation for such other assets and services, and then determines the compensation due for assets and services that *are* covered by the Policy (whether in a new voluntary agreement or following an action before the STB), it fundamentally alters the negotiating posture of the parties should they attempt to reach some new agreement with respect to non-covered assets and services.

59.    For example, the Cost Sharing Policy assigns no value to the dispatching rights that, in the Attleboro Line Agreement, both MBTA and Amtrak agreed that they "value highly."

In theory, MBTA and Amtrak could attempt to negotiate compensation for such rights, and the parties have attempted to do so.  Amtrak, however, has taken the position that it need not pay compensation for such rights in light of the Policy, and nothing in the Policy allows the STB to order compensation with respect to rights  that they are not covered by the Policy.

60.     The Cost Sharing Policy holds out the possibility of penalties if a state commuter rail agency does not provide Amtrak compensation required under the Policy.  Specifically, the Policy provides that the subject of a party's "fail[ure] to meet its required financial commitments under the policy . . . will be addressed specifically within the individual agreements and may include remedies such as: [f]inancial penalties, including appropriate interest charges for late payments[; r]eimbursement of costs and fees associated with the termination or restoration of service[; or o]ther arrangements consistent with the policy's overall intent."  Policy § 2.6.

### E.     Amtrak Demands Payment from MBTA

61.     In July of 2015, after the Commission adopted the interim Policy but before the Commission voted on the final Policy, Amtrak  proposed that the Attleboro Line Agreement be "amended" to incorporate the Cost Sharing Policy.  The proposed "amendments" would have gutted the Attleboro Line Agreement of the careful balance reached by the parties in 2003, and instead would have required all cost allocation to be determined pursuant to the Policy.

62.     Following adoption of the final Cost Sharing Policy, Amtrak approached MBTA and demanded that MBTA pay the cost allocations calculated by the Policy—$28.8 million for federal fiscal year 2016.  The amount requested consisted of $16.6 million for operating expenses, principally maintenance, and $12.2 million for capital projects.  Under the Attleboro Line Agreement, MBTA has no obligation to pay those sums to Amtrak.

63.     Amtrak's demand simply shifts to MBTA costs that Amtrak already is obliged to bear under the Attleboro Line Agreement.  Amtrak's demand is based on Amtrak's actual gross

costs, with no consideration of whether those expenses are reasonable or necessary and with no consideration of the revenue that Amtrak receives as a result of its use of MBTA's property. Under the Policy, MBTA would have no final say over how Amtrak will spend the $12.2 million that Amtrak is asking MBTA to pay this year for capital projects, even though MBTA is the actual owner of the Attleboro Line.

64.     Amtrak has threatened to take its demand for a new contract with new compensation terms to the STB if MBTA will not voluntarily enter a new contract to replace the existing Attleboro Line Agreement.  The parties engaged in extensive discussions to resolve this dispute short of litigation, but those negotiations failed to result in a negotiated resolution.

## CLAIMS FOR RELIEF

### COUNT ONE:  VIOLATION OF THE APPOINTMENTS CLAUSE

65.     MBTA realleges the allegations of Paragraphs 1-64 as if set forth fully herein.

66.     Only an "Officer" of the United States may exercise federal rulemaking authority. *Buckley v. Valeo*, 424 U.S. 1, 140-41 (1976).  Under the Appointments Clause, only the President can appoint an Officer, except that Congress may by law permit "inferior Officers" to be appointed by the head of an Executive Department or a court of law.  U.S. Const., art. II, § 2, cl. 2.  In no instance may an Officer of the United States be appointed by the chief executive of a State or the mayor of the District of Columbia.

67.     The Commission exercises executive authority.  It is the final decisionmaker that establishes the Cost Sharing Policy; the Policy is not subject to review or revision by the STB, the Secretary of Transportation, or any other federal official.  PRIIA requires Amtrak and state commuter rail agencies to implement the Cost Sharing Policy in new contracts.  If they fail to do so, the FAST Act withholds federal grants otherwise available under 49 U.S.C. § 24911.  The

Policy also is the only criterion that the STB is directed to consider in adjudicating compensation disputes between Amtrak and state commuter rail agencies in the Northeast Corridor, such as MBTA. 49 U.S.C. § 24905(c)(2). Indeed, but for the directive to apply the Policy, the statute would not provide the STB with any intelligible principle to make compensation decisions; the STB is told to look at § 24903 only for "procedures and [the] procedural schedule," not any substantive rule.

68.     Although they exercise executive authority, the members of the Commission are not appointed consistent with the Appointments Clause. Nine members of the Commission are appointed not by the President (or even the head of a federal department), but instead by the chief executives of the States and the District of Columbia within the Northeast Corridor. Four more members represent Amtrak.

69.     49 U.S.C. § 24905(c)(2) violates the Appointments Clause by vesting the Commission with executive authority.

70.     The Cost Sharing Policy adopted by the improperly appointed Commission is void *ab initio*. MBTA need not enter a new contract implementing the Policy and the STB may not enforce the Policy against MBTA.

71.     MBTA is entitled to a declaration that the composition of the Commission violates the Appointments Clause and that the Cost Sharing Policy adopted by the improperly constituted Commission is void.

### COUNT TWO:  VIOLATION OF THE SEPARATION OF POWERS

72.     MBTA realleges the allegations of Paragraphs 1-71 as if set forth fully herein.

73.     49 U.S.C. § 24905 provides the Commission with executive authority. Yet the nine Members of the Commission who are appointed by the chief executives of the States and

the District of Columbia are not accountable to the President because they are not removable by the President or any other member of the federal Executive Branch, whether for good cause or otherwise.  Instead, they serve "at the pleasure" of the chief executive who appointed them to the Commission.  49 U.S.C. § 24905(a)(1)(C).

74.     By conferring Commission members with executive authority while insulating them from any accountability to the Executive Branch, the FAST Act violates the Constitution's separation of powers.  *See Free Enter. Fund*, 561 U.S. at 496-97.

75.     The Cost Sharing Policy adopted in violation of the separation of powers is void *ab initio*.  MBTA need not enter a new contract implementing the Policy and the STB may not enforce the Policy against MBTA.

76.     MBTA is entitled to a declaration that the composition of the Commission violates the Constitution's separation of powers and that the Cost Sharing Policy adopted by the Commission is void.

## COUNT THREE:  VIOLATION OF THE DUE PROCESS CLAUSE

77.     MBTA realleges the allegations of Paragraphs 1-76 as if set forth fully herein.

78.     A key component of due process is that substantive rules be determined by regulators who are neutral and disinterested.  *Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936).

79.     The voting membership of the Commission is anything but disinterested in the subject matter that the Commission regulates.  The Cost Sharing Policy and its "standardized formula" will determine how tens of millions of dollars will flow in new agreements between— or STB orders enforced against—the federal and state agencies represented by the members of the Commission.  Amtrak and a majority of state commuter rail agencies represented on the

Commission save money under the Policy; their savings are at the expense of a minority of states, including Massachusetts.

80.     By giving the self-interested members of the Commission authority to set the terms of the Cost Sharing Policy, 49 U.S.C. § 24905(c)(2) violates the Due Process Clause of the Fifth Amendment.

81.     The Cost Sharing Policy adopted in violation of due process is void *ab initio*. MBTA need not enter a new contract implementing the Policy and the STB may not enforce the Policy against MBTA.

82.     MBTA is entitled to a declaration that § 24905 violates the Due Process Clause and that the Cost Sharing Policy adopted by the Commission is void.

**COUNT FOUR:  VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT**

83.     MBTA realleges the allegations of Paragraphs 1-82 as if set forth fully herein.

84.     The Commission is an agency of the federal government within the meaning of the APA, 5 U.S.C. § 551.

85.     Amtrak and state commuter rail agencies must comply with the Cost Sharing Policy by entering new contracts implementing the Policy; if they do not there are immediate legal consequences, such as ineligibility for grants otherwise available under § 24911.  The STB also must apply the Policy as its rule of decision in any adjudication under § 24905(c).  The Policy therefore constitutes a rule within the meaning of the APA.  With limited exceptions not applicable here, the APA requires all rules to be adopted through notice and comment rulemaking.  5 U.S.C. § 553.

86.     The Commission did not follow the APA's notice and comment requirements in adopting the Cost Sharing Policy.  The Policy was therefore adopted in violation of the APA.

87.     Because the Cost Sharing Policy was adopted "without observance of procedure required by law," 5 U.S.C. § 706(2)(D), the Cost Sharing Policy must be set aside and it may not be enforced against MBTA.

## COUNT FIVE:  BREACH OF CONTACT

88.     MBTA realleges the allegations of Paragraphs 1-87 as if set forth fully herein.

89.     The Attleboro Line Agreement is an existing, valid contract between MBTA and Amtrak.

90.     The Attleboro Line Agreement obligates Amtrak to provide MBTA with certain maintenance and dispatching services, and access to the Amtrak-owned rail line between Attleboro and Providence, without monetary compensation.

91.     The Attleboro Line Agreement specifically relieves MBTA of any obligation to provide maintenance to the Attleboro Line necessary or incidental to Amtrak's intercity rail passenger service.

92.     Amtrak claims that, pursuant § 24905, it need not comply with the Attleboro Line Agreement and instead MBTA must enter a new contract concerning the same subject matter.

93.     Amtrak insists that the new contract must depart from the terms of the existing Attleboro Line Agreement.  For example, while MBTA is not obligated to pay Amtrak for specified maintenance on the Attleboro Line under the Attleboro Line Agreement, Amtrak insists that under the new agreement MBTA must pay it many millions of dollars each year for such maintenance.

94.     Amtrak has repudiated the Attleboro Line Agreement.  MBTA does not accept that repudiation.

95.     MBTA is entitled to a declaration that Amtrak is in breach of the Attleboro Line Agreement.  MBTA also is entitled to an injunction requiring Amtrak to fulfill its obligations under that Agreement because an action for damages would provide an inadequate remedy for breach.  Amtrak's demand for significant, unanticipated payments could have adverse effects on the cost and/or quality of the services that MBTA provides its customers, resulting in a loss of goodwill among MBTA's customers and political constituents that cannot readily be calculated.

### COUNT SIX:  VIOLATION OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

96.     MBTA realleges the allegations of Paragraphs 1-95 as if set forth fully herein.

97.     Amtrak is obligated by the implied covenant of good faith and fair dealing not to execute its obligations under the Attleboro Line Agreement in a manner that denies MBTA its fruits of the Agreement, and Amtrak cannot leverage a threat of non-performance to negotiate a better deal for itself.

98.     Amtrak is insisting that MBTA enter a new contract in which MBTA pays Amtrak millions of dollars each year for services that Amtrak already is obligated by the Attleboro Line Agreement to provide without charge.  Amtrak also is threatening to go to the STB for a compensation order, on terms that under the Cost Sharing Policy will differ from those in the Attleboro Line Agreement, if MBTA does not agree to enter such a new contract.

99.     Amtrak's efforts to extract payments from MBTA for services that Amtrak already is contractually obliged to provide without charge violates the implied covenant of good faith and fair dealing in the Attleboro Line Agreement.  MBTA is entitled to a declaration that Amtrak is acting in breach of the implied covenant.  MBTA also is entitled to an injunction requiring Amtrak to fulfill its obligations under that Agreement pursuant to its terms because an action for damages would provide an inadequate remedy for breach.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests the following relief:

a)  A declaratory judgment holding that 49 U.S.C. § 24905(c) violates the

Appointments Clause, the Separation of Powers, and the Due Process Clause, and

that the Cost Sharing Policy adopted by the Commission is therefore void;

b)  A declaratory judgment that the Cost Sharing Policy was adopted in violation of 5

U.S.C. § 553, and a judgment setting aside the Policy for that reason;

c)  A declaratory judgment that Amtrak has breached the Attleboro Line Agreement,

and the implied covenant of Good Faith and Fair Dealing in that Agreement, and

an order enjoining Amtrak to comply with the Attleboro Line Agreement; and

d)  Such other and further relief that this Court deems just and proper.

Respectfully submitted,

MASSACHUSETTS BAY TRANSPORTATION
AUTHORITY

By its attorneys,


/s/  Kevin P. Martin
Kevin P. Martin (BBO# 655222)
Jaime A. Santos (BBO# 689946)
Eileen L. Morrison (BBO# 694208)
GOODWIN PROCTER LLP
53 State Street
Boston, Massachusetts 02109
Phone:  (617) 570-1000
Fax:  (617) 523-1231
KMartin@goodwinprocter.com
JSantos@goodwinprocter.com
EMorrison@goodwinprocter.com


William M. Jay (*pro hac vice pending*)
Brian T. Burgess (*pro hac vice pending*)
GOODWIN PROCTER LLP
901 New York Avenue NW
Washington, D.C. 20001
Phone:  (202) 346-4000
Fax:  (202) 346-4444
WJay@goodwinprocter.com
BBurgess@goodwinprocter.com


John C. Englander (BBO# 542532)
MASSACHUSETTS BAY TRANSPORTATION
AUTHORITY
10 Park Plaza
Boston, MA 02116
Phone: (857) 368-8600
Fax: (857) 368-0615
John.Englander@State.ma.us

DATED:  January 27, 2016